**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## NEWARK VICINAGE

CHRISTOPHER HALL,    :
                     :
        Petitioner,  :    Civil Action No. 14-0069(SRC)
                     :
    v.               :    **OPINION**
                     :
STEPHEN D'ILIO, ET AL.,   :
                     :
        Respondents. :

**CHESLER**, District Judge

This matter is presently before the Court pursuant to the submission of a Petition for a Writ of Habeas Corpus under Title 28 U.S.C. § 2254 [ECF No. 6], by the Petitioner Christopher Hall ("Petitioner"). For the reasons stated below, the Petition will be denied.

I. Procedural History

Petitioner is presently confined at New Jersey State Prison, in Trenton, New Jersey. (Pet. at 1.) He is imprisoned after conviction by a jury in the Superior Court of New Jersey, Passaic County, on February 15, 2005 for: first-degree robbery, N.J.S.A. 2C:15-1 and 2C:2-6 (count two); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-

4(a) (count three); and third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count four). State v. Hall, Indictment No. 03-07-0677, 2008 WL 1820023 (N.J. Super. Ct. App. Div. Apr. 24, 2008)(per curiam).

On February 4, 2005, the sentencing court merged Petitioner's conviction for unlawful possession of a weapon for an unlawful purpose with his robbery conviction, granted the State's motion for an extended term of incarceration pursuant to N.J.S.A. 2C:43-6C, and sentenced Petitioner to 55 years imprisonment with an 85% parole ineligibility qualifier. (Answer to Petition for Writ of Habeas Corpus ("Answer") ECF No. 12 at 7, and Attachment Da7.) The sentencing court also imposed a consecutive five-year sentence with a 2½ year parole ineligibility on Count 4, unlawful possession of a weapon. (Id.)

Petitioner appealed, and the Appellate Division affirmed the convictions but remanded for resentencing, and reversed the consecutive nature of the sentence on Count 4. (Answer at 8); Hall, 2008 WL 1820023, at *1. The New Jersey Supreme Court denied certification on July 3, 2008. (Answer at 8, and Attachment Da44.)

Petitioner filed a petition for post-conviction relief on on September 23, 2008. (Pet. at 18.) The PCR Court conducted a hearing and denied the petition on November 5, 2010. (Id. ¶11(a)(8); Answer at 9.) The Appellate Division affirmed on May

2

14, 2013. State v. Hall, 2013 WL 1953655 (N.J. Super. Ct. App. Div. May 14, 2013)(per curiam). The New Jersey Supreme Court denied certification on November 8, 2013. (Answer at 9.)

Petitioner initiated his habeas proceeding on January 6, 2014. (ECF No. 1.) Petitioner alleged the following Grounds for Relief:

> GROUND ONE: The Trial Court Failed to Adequately Instruct the Jury Regarding Accomplice Liability and the Need to Determine the Defendant's Criminal Culpability with Respect to Different Degrees of Robbery.
>
> GROUND TWO: The Trial Court Erred in Failing to Substitute an Alternate Juror During Deliberations, Instead Permitting a Juror to Continue Deliberations Despite Indications He Was Unable to Effectively Continue to Do So Due to His Medical Condition.
>
> GROUND THREE: The Defendant Was Denied His Right to a Fair Trial As the Result of Inadmissible Hearsay Which Significantly Prejudiced the Defense by Characterizing the Defendant as Having Formulated the Plan to Rob the Victim.
>
> GROUND FOUR: Defendant's Convictions Must Be Reversed Because He Was Denied Effective Assistance of Counsel, in that Trial Counsel Misadvised Defendant as to the State's Plea Offer and/or Failed to Adequately Communicate the Plea Offer to Defendant.

(Pet. ¶12, ECF No. 6.)

II. Response to the Petition

Respondent asserted the following in its answer to the petition: (1) the trial court properly instructed the jury on

3

accomplice liability and the need to determine Defendant's
culpability regarding different degrees of the robbery offense;
(2) the trial court's decision to permit a juror to continue
deliberating was reasonable, given he unequivocally indicated
that he was willing to continue, and all defense counsel allowed
the juror to continue; (3) Petitioner has not demonstrated that
the trial court's evidentiary ruling resulted in error, much
less error of constitutional magnitude; and (4) Petitioner's
habeas claim for ineffective assistance of trial counsel lacks
merit, as the state courts made reasonable findings of facts and
applied the appropriate legal standards in denying post-
conviction relief. (Answer at 3.)

III.  Analysis

    A.   Standard of Review

28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus
> on behalf of a person in custody pursuant to
> the judgment of a State court shall not be
> granted with respect to any claim that was
> adjudicated on the merits in State court
> proceedings unless the adjudication of the
> claim--
>
>> (1) resulted in a decision that was
>> contrary to, or involved an
>> unreasonable application of, clearly
>> established Federal law, as determined
>> by the Supreme Court of the United
>> States; or
>> (2) resulted in a decision that was
>> based on an unreasonable determination
>> of the facts in light of the evidence

> presented in the State court
> proceeding.

"Contrary to clearly established Federal law" means the state court applied a rule that contradicted the governing law set forth in Supreme Court precedent or that the state court confronted a set of facts that were materially indistinguishable from Supreme Court precedent and arrived at a different result than the Supreme Court. Eley v. Erickson, 712 F.3d 837, 846 (3d Cir. 2013)(citing Williams v. Taylor, 529 U.S. 362, 405 (2000)). An "unreasonable application" of clearly established federal law is an "objectively unreasonable" application of law, not merely an erroneous application. Id. (quoting Renico v. Lett, 130 S.Ct. 1855, 1862 (2010)).

On habeas review, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "The test for § 2254(d)(2)'s "unreasonable determination of facts" clause is whether the petitioner has demonstrated by "clear and convincing evidence," § 2254(e)(1), that the state court's determination of the facts was unreasonable in light of the record" at the time of the state court's adjudication. Rountree v. Balicki, 640 F.3d 530, 537–38 (3d Cir. 2011)(citations omitted).

5

B.   <u>State Court Factual Findings</u>

The facts, as stated by New Jersey Superior Court Appellate
Division on direct appeal are as follows.

> According to the State's proofs at trial,
> Michael Messina, an admitted drug dealer
> previously convicted of robbery and drug
> possession, while driving in Paterson on
> March 15, 2003 at around 3:00 a.m., observed
> two women, Dawn Smith and Ebony Morris,
> standing on the sidewalk near Auburn Street.
> He thought Dawn was a woman he knew as "Stay
> High," who was actually Dawn's sister. When
> he got closer, however, he realized he was
> mistaken but nevertheless stopped to talk to
> the women, hoping to have sexual relations.
> Ebony declined because she had a boyfriend,
> but Dawn indicated an interest even though
> she had a boyfriend, who happened to be
> defendant, the father of her child. Messina
> offered them a ride to the store where they
> were headed, and then to their home, and
> they accepted.
>
> On the way home, Messina received a call
> from a customer who wanted to purchase
> marijuana. Messina took a quick detour to
> meet him, removed some drugs from his
> console and sold his customer the marijuana
> from his car, witnessed by both Ebony and
> Dawn. After completing the transaction,
> Messina drove the women home but first
> obtained Dawn's phone number and made plans
> to get together the next day.
>
> As Dawn entered her apartment with Ebony,
> she met Rodney, Ellis, defendant, her sister
> "Stay High", and another female, who were
> all inside. According to Dawn, when Rodney
> overheard her discussing Messina's money and
> large drug stash, he devised a plan whereby
> Dawn would go to Messina's house and keep
> him occupied while taking a shower, at which
> time Ebony would open the door for Rodney
> and Ellis. As Rodney explained his plan,

6

defendant resisted and even left the
apartment, while Ellis sat quietly and
nodded his head.

The next morning, Messina returned Dawn's
numerous calls and arranged to meet her
later at her house. As Messina arrived
around 1:30 p.m. and waited for Dawn to come
out, he noticed three black men staring at
him as they walked past his vehicle. After
they entered Dawn's building, Dawn and Ebony
appeared. Messina was surprised to see
Ebony, but Dawn assured him Ebony would just
sit in the living room watching television
and smoking marijuana.

When they arrived at Messina's home, which
was about two miles from where Dawn lived,
he brought the drugs from his car inside,
locked the door behind him and immediately
went upstairs to put the drugs in a dresser
drawer in his bedroom. When he came back
downstairs, Dawn asked to use the telephone
and, unbeknownst to Messina, called Ellis to
give him Messina's address. In the meantime,
Messina gave Ebony a bag of marijuana. When
Dawn finished her telephone conversation,
she and Messina took a shower together in
the first floor bathroom. While they were in
the shower, Ebony knocked on the door and
told Messina that his cell phone was
ringing. Messina answered the call, which
was from a preferred customer wishing to
purchase marijuana. Messina agreed. He and
Dawn exited the shower, got dressed, and all
three left together.

Once outside, Messina noticed the same three
men walking down his street whom he had seen
earlier in front of Dawn's building. When he
asked Dawn if she knew them, she responded
no. Thinking it merely coincidental, Messina
proceeded with the two women to the
customer's house where he exited his car
with five bags of marijuana, and completed
the transaction. The trio returned to his
house.

7

Upon arrival, Messina followed the same routine of bringing all of his drugs into his house, locking the door behind him, and hiding the drugs in his bedroom. Messina and Dawn again entered the shower and were again interrupted by Ebony who this time told them she was going outside to smoke a cigarette. Almost immediately thereafter, Ellis "ripped the shower curtain down" holding a firearm. Messina recognized the man to be one of the three men he first saw in front of Dawn's building, and then again in front of his house. Dawn immediately got out of the shower, grabbed her clothes, and left the bathroom without any resistance from Ellis. Ellis then demanded Messina's money and drugs, but Messina said that he did not have either. Ellis persisted, however, and ordered Messina out of the shower.

Messina was forced to lie down naked on his living room floor where he noticed a second man, defendant, wearing what he believed to be a bandana over his face. Based on the man's build and facial features not covered by the mask, Messina believed defendant was also one of the men he had seen previously. Defendant restrained Messina with a cord from his vacuum cleaner and Messina's belt, and assured him that once Messina gave them the drugs and money, they would leave.

In an attempt to isolate defendant, who appeared to be unarmed, Messina told the men that the drugs were outside in the car. Once alone, it was Messina's plan to restrain defendant. However, it was defendant who checked the vehicle, leaving Ellis, who was armed, behind. At this point, Dawn entered the kitchen, and signaled to Ellis that the drugs were upstairs. Ellis then returned to Messina, placed the gun against his head, and angrily told him to stop playing around because he knew the drugs were upstairs.

Messina finally told Ellis exactly where the
drugs were located because, at that point,
"it was getting serious[,]" and he was also
worried that his mother would arrive home.
Together, defendant and Dawn went to
Messina's bedroom, while Ellis remained with
Messina holding the gun to his head. Shortly
thereafter, defendant descended the stairs
holding the drugs.

At this point, the doorbell rang and the
door began to open. Ellis turned and fired
the gun without warning, shooting Ebony as
she was reentering the house. Ellis and
defendant ran out the front door, while Dawn
stayed behind. Messina untied himself,
wrapped a coat around his waist, ran
outside, and saw Ellis sprinting away, with
Rodney, the third man he had seen earlier in
the day, lightly jogging down the block.

When Messina went back into the house, he
found Ebony lying on the ground motionless
with the gun next to her. Dawn was yelling
frantically for Messina to help Ebony. When
he returned, the gun had disappeared. Dawn
had thrown it out the bathroom window for
fear Ellis would return and kill her to
cover up his crime. Messina called 9-1-1.

Ebony died of a bullet wound to the face.
When police arrived, they questioned Dawn
and Messina separately. At first, Dawn
portrayed herself as a victim, explaining
that she was in the shower with Messina when
two black males entered the home, forced
them out of the shower, robbed them, and
shot Ebony in the process. Messina then also
informed the officers that the firearm had
disappeared from the living room floor when
he went upstairs to get dressed. Later,
Detective Rafael Fermin, while walking
around the perimeter of the house,
discovered the firearm lying right outside
the bathroom.

9

At the police station, Dawn admitted her
role in the robbery. She and Messina
identified defendant and the two co-
defendants through photographs, and both
gave formal statements.

During the course of the ongoing
investigation, the police received
information that on May 2, defendant would
be traveling by bus to the Port Authority in
New York under the name Tesfiete Planno.
After police confirmed this information with
Greyhound, they proceeded to the bus
terminal where they observed defendant exit
the bus, looking basically the same, with
the exception of highlighted hair. At first,
defendant denied that he was Christopher
Hall. However, when the police showed
defendant a wanted poster with his picture,
he replied "you got me." Defendant was read
his Miranda rights, and placed under arrest.
During the subsequent interview, defendant
denied any involvement in the robbery
explaining that he, Dawn and Messina were
just hanging out at Messina's house when
Ebony decided to go to the liquor store.
When she returned, defendant heard a shot
fired and saw Ebony lying on the floor.
Scared, defendant ran to his mother's house.

Evidently crediting the State's version, the
jury found defendant guilty of armed robbery
and the related weapons offenses.

State v. Hall, 2008 WL 1820023, at *1-3.

The Appellate Division then made the following factual

findings in affirming the PCR Court's denial of Petitioner's

petition for post-conviction relief.

As of 2004, defendant faced charges in five
pending indictments. On January 26, 2004,
the trial judge conducted a pre-trial
conference on the record, in defendant's
presence, regarding one of the indictments

10

(02-04-414). At this proceeding, the
assistant prosecutor verified that the
State's global offer to resolve all five
indictments was a sentence recommendation of
twenty years in prison, subject the No Early
Release Act (NERA), N.J.S.A. 2C:43-7.2. Two
lawyers appeared for defendant at the
hearing. The first attorney appeared on 02-
414-04. The second attorney was present
because he represented defendant on the
other indictments. The judge allowed both
attorneys to meet with defendant to discuss
the proposed resolution of all charges.
Defendant rejected the plea offer, proceeded
to trial on 02-414-04, and was found guilty
of several of the charges.

In indictment 03-07-677, the State charged
defendant with first-degree robbery,
N.J.S.A. 2C:15-1 and N.J.S.A. 2C:2-6;
second-degree possession of a weapon for an
unlawful purpose, N.J.S.A. 2C:39-4a; and
third-degree unlawful possession of a
weapon, N.J.S.A. 2C:39-5b. In October 2004,
defendant proceeded to trial and a jury
found defendant guilty of these charges.

In 03-07-677, the judge imposed an aggregate
extended sentence of sixty years in prison
with forty-nine and a quarter years without
parole, concurrent to his sentence on the
other indictments. We affirmed the
convictions, but remanded for re-sentencing
in accordance with State v. Thomas, 188 N.J.
137 (2006), and State v. Natale, 184 N.J.
458 (2005). State v. Hall, No. A-2652-05
(App.Div. Apr. 24, 2008). The Supreme Court
denied certification. State v. Hall, 207
N.J. 35 (2011).

Defendant filed a pro se petition for PCR
and his designated counsel thereafter filed
an amended petition and brief. Defendant
argued that his trial counsel failed to
accurately advise him about the global
offer. Defendant asserted that had he known

11

about the plea offer, he would have accepted
it.

In November 2010, Judge Joseph A. Falcone
conducted an evidentiary hearing. The judge
listened to testimony from defendant and his
two lawyers. Both lawyers testified that an
assistant prosecutor made the global offer,
they discussed the offer with defendant, and
defendant rejected it. Defendant testified
that his attorneys indicated the global
offer was a sentencing recommendation of
twenty-five years in prison, not twenty
years. Judge Falcone then stated that

The critical issue is ... whether or not
[defendant] made an informed decision to
proceed to trial. In that regard[,] I've
heard this morning the testimony of three
witnesses: [the first attorney] on one of
his five indictments; [the second attorney]
on the other four indictments, two of which
went to trial—on one of them he was
acquitted; on one [03-677-07] he was
convicted ... and he pled guilty as to
another. [The second attorney] cannot
remember the outcome of the remaining
indictment.

....

There's disparity in the recollections of
the two lawyers on the one hand versus
[defendant] on the other. The [January 26,
2004] transcript doesn't appear to bear out
[defendant's] statement that the plea offer
was [twenty-five years]. It's clear [that]
... the offer [was twenty years].

[Defendant] understood [that] when he went
into the jury room on January 26, 2004, it
was to discuss all five cases, that the
offer made was to cover all five cases.

....

12

[Defendant] says ... [that] the offer was
[twenty-five]. That's not born[e] out by the
official record. That's not born[e] out by
the testimony [from both attorneys]. So
[defendant] is mistaken in that regard.

....

[The assistant prosecutor elicited from
defendant] that [defendant] never wanted to
plead guilty [in indictment 03-07-677] ...
[because] he wanted his day in court.

....

On the issue of credibility, it's a
nobrainer. Neither lawyer came in and was
remembering word-for-word what went on; but
both did what they're required to do as an
officer of the court, and that's let the
client know what the offer is, the strengths
and weaknesses of the case.

....

I accept as truthful the testimony provided
by both [lawyers]. The transcript ...
supports what they said; the plea offer was
[twenty to do eighty-five percent] to cover
everything.... I'm satisfied that both
counsel conveyed to [defendant] their views
as to the worth of that plea offer vis-à-vis
the proofs in the various cases, including
[the] two separate robbery trials.

The judge then denied the PCR petition and
defendant's subsequent motion for
reconsideration.

State v. Hall, 2013 WL 1953655, at *1-2 (footnotes omitted).

    C.    Ground One

    In Ground One of the habeas petition, Petitioner alleged:

"the trial court failed to adequately instruct the jury

13

regarding accomplice liability and the need to determine the Defendant's criminal culpability with respect to different degrees of robbery." (Pet. at 7-8.) Petitioner contended the trial court's failure necessarily tainted the jury's verdict. (Id. at 8.)

Respondent asserted Petitioner has not demonstrated that the state appellate court decision was unreasonable. (Answer at 21.) On direct appeal, Petitioner claimed that the trial court did not adequately instruct that an accomplice may be guilty of a lesser offense than a principal. (Id. at 23.)

The New Jersey Superior Court Appellate Division held:

> The State's case against defendant was founded on a theory of accomplice liability. "When a prosecution is based on the theory that a defendant acted as an accomplice, the trial court is required to provide the jury with understandable instructions regarding accomplice liability." State v. Savage, 172 N.J. 374, 388 (2002). The Savage Court explained,
>
>> By definition an accomplice must be a person who acts with the purpose of promoting or facilitating the commission of the substantive offense for which he is charged as an accomplice. Therefore, a jury must be instructed that to find a defendant guilty of a crime under a theory of accomplice liability, it must find that he shared in the intent which is the crime's basic element, and at least indirectly participated in the commission of the criminal act.

14

[Ibid. (internal citations and quotes and citations omitted).]

. . .

Defendant does not challenge the court's definition of accomplice liability. Instead, as noted, he argues the court did not adequately instruct that an accomplice may be guilty of a lesser offense than that of the principal. Such a claim, however, may not be viewed in isolation, but must be considered against the whole of the jury charge to determine its overall effect. State v. Wilbely, 63 N.J. 420, 422 (1973).

Here, the judge expressly informed that the culpability of an accomplice depends on his individual state of mind:

> As I explained earlier ... our law recognizes that two or more persons may participate in the commission of an offense but each may participate therein with a different state of mind. The liability or responsibility of each participant for any ensuing offense is dependent upon his own state of mind and not anyone else's.

The judge reiterated this concept of the differing degrees of culpability based on differing mental states when he referenced a hypothetical he gave earlier in his instructions concerning a handyman working in someone's home who gives a third party directions on how to break in undetected:

> Earlier I illustrated the concept of legal accountability for the conduct of another by reason of the hypotheticals I gave you about the handyman and the various ways that culpability can be different

15

between different people connected
in the same venture.

In considering whether a defendant
is guilty or not guilty as an
accomplice to the crime of robbery
or robbery while armed or theft
from the person, in the case of
Kenton Rodney, remember that each
person who participates in the
commission of an offense may do so
with a different state of mind and
the liability or responsibility of
each person is dependent upon his
own state of mind and no one
else's.

The hypothetical to which he was referring
is set out in full:

And the reason I'm telling you
about this is because I want to
give you a hypothetical situation
to explain the proposition that in
the law people, even though
they're involved in the same
venture, can have different
degrees of culpability or
responsibility.

An here[']s what I mean by that,
let's suppose the handyman said,
look, in order ... for you to do
this there is always this uncle in
the house. You're going to need to
take a gun just to keep him quiet
or in case he shows up or comes
from upstairs, downstairs. You
better take a gun just in case.
Now, his purpose is to promote or
facilitate a burglary done while
armed, so he would be guilty of
that second degree of burglary. A
higher degree of burglary because
his purpose was to promote or
facilitate that.

16

Let's suppose, on the other hand,
he never had a thought about a
gun, didn't say anything to his
associate who's going to go in the
house but that person decided,
look, I think just for my own
purposes I'm going to take a gun
with me. Okay. Now the handyman,
his purpose is to promote or
facilitate a simple burglary. He
would be guilty of that if it was
proven by the evidence beyond a
reasonable doubt; the man who went
in the home would be guilty of a
higher crime, a higher degree of
burglary, because he did the
burglary while being armed.

So, you can see in that
hypothetical there are different
degrees of responsibility even
though the two people are involved
in the same venture.

Let's suppose the handyman never
had any thoughts of a burglary. He
never had a purpose to promote or
facilitate a burglary but he told
his friend about the jewelry in
the house and how this door, they
don't lock the back door, but he
did not have a purpose to promote
or facilitate any crime. He
wouldn't be guilty of anything
even though his information is
what was used by his associate who
then went in and did the burglary
in whatever form and stole
property from in the house.

So, when you're dealing with
accomplice liability you have to
examine each individual person
involved in the venture separately
and their guilt is dependent on
their state of mind and what their
purpose was. So you have to

17

> > deliberate the involvement and the
> > state of mind and the purpose of
> > each person involved separately,
> > if you first find that they are
> > involved together.
>
> > We are satisfied that the court's jury
> > charge, considered in its entirety, clearly
> > instructed that participants in a criminal
> > venture can have different degrees of
> > culpability based on their own individual
> > state of mind.
>
> > . . .

State v. Hall, 2008 WL 1820023, at *4-7.

The test announced by the Supreme Court in Estelle v.
McGuire, 502 U.S. 62, 72 (1991) governs constitutional claims
that an erroneous jury instruction "by itself so infected the
entire trial that the resulting conviction violates due
process." The jury instruction must be viewed in the context of
the instructions as a whole and the trial record. Id. It is not
enough if the jury instruction was improper under state law;
there must be a reasonable likelihood that the jury applied the
instructions in such a manner as to violate the Constitution.
Id.

Petitioner has offered no explanation of how the jury
instruction so infected the entire trial as to violate due
process, let alone how the state court's decision involved an
unreasonable application of the Estelle test. Here, the state
appellate court reasonably found that the hypothetical used by

18

the trial court provided a clear illustration of the law
concerning intent and lesser offenses in accomplice liability.
Thus, there was no constitutional error in the jury instruction,
and Ground One will be denied.

     D.    <u>Ground Two</u>

    Petitioner claimed, in Ground Two of the habeas petition,
that the trial court erred by permitting a juror to continue
deliberations despite his medical condition. (Pet. ¶12, Ground
Two.) Petitioner alleged the court erred because the juror had
been hospitalized for a heart problem, and he was allowed to
continue deliberating instead of being replaced by an alternate.
(<u>Id.</u>) Respondent asserted that Petitioner failed to articulate
why the court's decision not to remove the juror was erroneous
or how such error violated the Constitution. (Answer at 30.)

    This Court construes Petitioner's claim as alleging the
juror's medical condition prevented him from effectively serving
as a juror. The state appellate court rejected this claim for
two reasons: (1) defense counsel agreed to permit the juror to
continue; and (2) the trial judge did not abuse his discretion
in light of the juror's unequivocal representations that he was
willing to continue deliberating despite his chest pain. <u>State
v. Hall</u>, 2008 WL 1820023 at *7-9.

    Petitioner has pointed to nothing in the record to support
a finding that the juror's condition was so severe that he could

not function in his role as a juror. Petitioner has not rebutted
the presumption of correctness of the state appellate court's
finding that the juror in question unequivocally represented
that he was willing to continue deliberating despite his medical
concerns. Furthermore, Petitioner has not identified controlling
Supreme Court precedent, let alone how the state appellate
court's decision involved an unreasonable application of Supreme
Court precedent. The Court finds no merit to Ground Two.

    E.   <u>Ground Three</u>

    In Ground Three of the habeas petition, Petitioner alleged
he was denied his right to a fair trial because hearsay evidence
significantly prejudiced the defense by suggesting Defendant
formulated the plan to rob the victim. (Pet. ¶12, Ground Three.)
Petitioner further contended the limiting instruction was
insufficient. (<u>Id.</u>)

    Respondent noted that the habeas petition did not even
identify the alleged hearsay or who gave the testimony. (Answer
at 31.) On direct appeal, Petitioner argued Witness Messina
testified to Dawn Smith's out-of-court statement that Petitioner
planned the robbery. (<u>Id.</u>)

    Petitioner failed to set forth his claim in sufficient
detail meet the habeas standard for relief. Even if Petitioner
had identified the hearsay testimony that he challenged, and if
he had identified the controlling Supreme Court precedent, his

claim would fail. "A federal habeas court is limited to deciding whether the admission of the evidence rose to the level of a due process violation." Keller v. Larkins, 251 F.3d 408, 416 n. 2 (3d Cir. 2001).

> As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.

Lisenba v. People of the State of California, 314 U.S. 219, 236 (1941).

The test on habeas review is whether the state appellate court unreasonably applied this holding in rejecting Petitioner's claim that admission of the hearsay evidence, even with the trial court's limiting instruction, violated due process. The Appellate Division ruled:

> During cross-examination, Messina was asked whether he had spoken with Dawn after Ebony was killed. Messina responded that two or three months later, he spoke to Dawn over the telephone, and she attempted to convince him that she did not try to rob him, that she was innocent. She told him that "it was her baby's father that was behind it all." R. 2:10-2.
>
> .  .  .
>
> First, and most importantly, the trial judge gave a curative instruction *immediately* after the hearsay statement was elicited.

21

The instruction emphatically indicated that
the jury was not to consider the statement
as evidence against defendant. . . .

Second, the evidence against defendant was
substantial . . . There was the testimony of
Dawn, his girlfriend and mother of his
child, indicating that defendant directly
participated in the robbery. Similar
testimony was proffered from Messina.
Moreover, when defendant was confronted at
the police station by the police, he
initially denied his true identity and,
indeed, was traveling under an alias,
leading to an inference of guilt.

Finally, Dawn herself, the declarant,
testified at trial . . . She was subjected
to full cross-examination and the jury had
an opportunity to evaluate her credibility
as well as Messina's. In fact, on the
critical issue of who planned the robbery,
Dawn repeatedly testified at trial that it
was Rodney, not defendant, who devised the
plan. We recognize, of course, the fact that
Dawn testified does not render admissible
what might otherwise be inadmissible
hearsay-not being subject to cross-
examination at the time of the challenged
statement. However, we conclude that since
the jury had the opportunity to hear, weigh,
and evaluate the testimony of Dawn as well
as Messina regarding the making of the
statement, the error, if any, was not
clearly capable of producing an unjust
result . . .

State v. Hall, 2008 WL 1820023, at *9-*11 (internal citations

omitted).

The state appellate court gave legitimate reasons why the

effect of the hearsay evidence on the trial was not

fundamentally unfair, including the forceful limiting

instruction given by the judge, and by the declarant's trial
testimony that it was someone other than defendant who planned
the robbery. There was nothing unreasonable about the state
appellate court's application of controlling Supreme Court
precedent. Therefore, Ground Three will be denied.

     F.   Ground Four

Petitioner's final claim for relief is that he was denied
effective assistance of counsel because counsel incorrectly or
inadequately communicated a plea offer to him. In support of
this claim, Petitioner asserted he was not advised of the global
plea offer until January 26, 2004, when Judge Rothstadt outlined
the global plea offer and described the potential consequences
of rejecting the offer. (Pet., ¶12, Ground Four(a)). Respondent
asserted that Petitioner's bare arguments, unsupported by
factual allegations, fell short of establishing a reviewable
habeas claim. (Answer at 34.)

On habeas review, the court must look to the state court's
decision. The Appellate Division stated:

> As of 2004, defendant faced charges in five
> pending indictments. On January 26, 2004,
> the trial judge conducted a pretrial
> conference on the record, in defendant's
> presence, regarding one of the indictments
> (02-04-414). At this proceeding, the
> assistant prosecutor verified that the
> State's global offer to resolve all five
> indictments was a sentence recommendation of
> twenty years in prison, subject the No Early
> Release Act (NERA), N.J.S.A. 2C:43-7.2. Two

> lawyers appeared for defendant at the
> hearing. The first attorney was present
> because he represented defendant on the
> other indictments. The judge allowed both
> attorneys to meet with defendant to discuss
> the proposed resolution of all charges.
> Defendant rejected the plea offer, proceeded
> to trial on 02-414-04, and was found guilty
> of several of the charges.
>
> In indictment 03-07-677, the State charged
> defendant with first-degree robbery,
> N.J.S.A. 2C:15-1 and N.J.S.A. 2C:39-4a; and
> third-degree unlawful possession of a
> weapon, N.J.S.A. 2C:39-5b. In October 2004,
> Defendant proceeded to trial and a jury
> found defendant guilty of these charges. . .

State v. Hall, 2013 WL 1953655, at *1-2 (internal footnotes

omitted). Given these factual findings, the Appellate Division

held that Petitioner had not satisfied either prong of the test

for ineffective assistance of counsel under Strickland v.

Washington, 466 U.S. 668 (1984). Id. at *2.

Here, Petitioner claims his trial counsel did not tell him

of the global plea offer before the January 26, 2004 pretrial

conference. While this contention is consistent with the facts

found by the Appellate Division on PCR review, Petitioner has

not established how he was prejudiced by not being told of the

global plea offer sooner.

The Appellate Division found that the trial judge allowed

two defense attorneys to meet with Petitioner during the January

26, 2004 pretrial conference to discuss the global plea offer.

Nonetheless, Petitioner rejected the offer and went to trial.

24

These facts do not suggest counsel was ineffective. Even if counsel should have advised Petitioner of the global plea offer sooner, there was no prejudice because Petitioner could have accepted the plea offer at the pretrial conference. The Court will deny Ground Four.

IV.   Conclusion

For the reasons discussed above, the Court will dismiss the habeas petition with prejudice.

V.    Certificate of Appealability

This Court must determine whether Petitioner is entitled to a certificate of appealability in this matter. See Third Circuit Local Appellate Rule 22.2. The Court will issue a certificate of appealability if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The discussion of Petitioner's claims above demonstrates that Petitioner has not made such a showing, and this Court will not issue a certification of appealability.

DATED:_____6/17/15_____

_____
STANLEY R. CHESLER
United States District Judge

25